IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 10, 2017 Session

## STATE OF TENNESSEE v. ROSEMARY L. DECOSIMO

**Appeal from the Criminal Court for Hamilton County**
**No. 287934   Paul G. Summers, Senior Judge**

_____

### No. E2017-00696-CCA-R3-CD

_____

Defendant-Appellant Rosemary L. Decosimo entered a plea of nolo contendere to driving under the influence per se and reserved a certified question regarding the trial court's denial of her motion to dismiss the indictment, or in the alternative, motion to suppress the test results from her blood test. She argues on appeal that the trial court erred in denying her motion on the basis that Tennessee Code Annotated section 55-10-413(f), which gives the Tennessee Bureau of Investigation $250 for each DUI conviction that is obtained using a blood or breath test, is unconstitutional. For the reasons that follow, we agree with Decosimo and reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jerry H. Summers, Benjamin McGowan, and Marya Schalk, Chattanooga, Tennessee, for the appellant, Rosemary L. Decosimo.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; M. Neal Pinkston, District Attorney General; Matthew O'Brien, Special Prosecutor Pro Tem; and Kate Lavery, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In May 2013, the Hamilton County Grand Jury indicted Decosimo with failure to yield, driving without a license in her possession, failure to maintain her lane, driving under the influence (DUI), and DUI per se. On January 31, 2014, Decosimo filed a motion to dismiss the indictment, or in the alternative, to suppress the evidence from her blood test, arguing that Code section 55-10-413 is unconstitutional because it creates a

fee system that violates the right to due process and a fair trial. Decosimo's motion was consolidated for the purpose of argument with the motions of over twenty similarly-situated defendants who also had provided blood or breath samples to law enforcement, and these motions were heard before the three Hamilton County Criminal Court Judges, sitting en banc.

**Hearing on Motion to Dismiss, or in the Alternative, Motion to Suppress.** At the August 1, 2014 hearing on this consolidated motion, the defense argued that Code section 55-10-413(f) violated the defendants' right to due process and a fair trial. Defense counsel suggested that the trial court had four options in ruling on this motion: (1) the court could deny the motion; (2) the court could order that the jury be given an instruction that the TBI has a financial interest in obtaining DUI convictions and that the jury would determine the credibility of any breath or blood tests in light of this financial interest; (3) the court could suppress and exclude the results from the blood or breath tests; or (4) the court could dismiss the indictments in light of the egregiousness of the constitutional violations.

The parties then submitted the following written stipulations of fact for the purposes of this hearing:

1. The above named defendants as well as the defendants listed on Exhibit A attached hereto (hereinafter "Defendants") are charged in the Hamilton County Criminal Court with driving under the influence (DUI), vehicular assault and/or vehicular homicide related to the operation of a motor vehicle while allegedly under the influence of an intoxicant.

2. Each of the Defendants has filed a Motion to Dismiss: Blood Testing Evidence which raise[s] identical issues of law and the hearing of which has been consolidated for hearing before the three judges of the Hamilton County Criminal Court.

3. Each of these Defendants provided, either voluntarily or involuntarily, a breath or blood sample to law enforcement in conjunction with their arrests.

4. In the case of the blood samples, the Defendants' blood was sent to the Tennessee Bureau of Investigation Forensic Services Division where it was tested for the presence and concentration of ethyl alcohol or other intoxicants.

5. In the case of the breath samples, the Defendants provided a breath sample which was tested by a breath analysis machine, specifically model

EC/IR II, for the presence and concentration of ethyl alcohol. The breath analysis machines upon which this testing was performed are calibrated, maintained and certified by the Tennessee Bureau of Investigation.

6. In addition to testing the blood samples and calibrating and certifying the breath analysis machines, agents of the Tennessee Bureau of Investigation (TBI) are regularly called as witnesses in court at pretrial hearings and trial to testify regarding the testing process, equipment, results of testing, and other matters relevant to the chemical analysis of the blood or breath evidence. In some cases, the actual written reports of the chemical testing are admitted into evidence at pretrial hearings and/or trial.

7. Each of the Defendants, if convicted, will be subject to certain fees, specifically BADT and BAT fees, to be paid as part of their court costs.

8. No BADT or BAT fees are charged where a case is dismissed, a not guilty verdict returned, or where a defendant pleads to a non-DUI related offense.

9. By statute, these BADT and BAT fees are collected by the court clerk for the applicable court and are paid ultimately to the Tennessee Bureau of Investigation where they are used for all TBI agency operational costs as permitted by statute.

Decosimo also admitted as an exhibit TBI Director Mark Gwyn's February 11, 2014 testimony before the Senate Judiciary Committee. As a part of this testimony, Director Gwyn referenced the TBI's financial report from the Intoxicant Testing fund where the $250 Blood Alcohol or Drug Concentration Test (BADT) fees are deposited, which depicted the total amount of revenue from this fund and the total expenses for the fiscal years of 2009-2012. He stated that in 2009, the TBI had revenues from the intoxicant testing fund of approximately $999,000 and expenses of $750,000; in 2010, the TBI had revenues from the fund of around $1,011,000 and expenses of $690,000; in 2011, the TBI had revenues from the fund of approximately $1,500,000 and expenses of $1,400,000; and in 2012, the TBI had revenues from the fund of around $2,500,000 and expenses of $1,500,000, which accounted for a total surplus for the years 2009-2012 of approximately $1,600,000. Director Gwyn stated that this surplus was used for "equipment, training" in the TBI. He added, "in 2008, we were faced with some pretty deep cuts, cuts that would have at least caused us to do one of two things: [w]e would've had to shut down some disciplines with our crime laboratory, or we would've had to start charging local law enforcement for testing." He explained that because neither of these options were good, the TBI decided to increase the BADT fee on toxicology and blood

alcohol testing to $250. The TBI's financial report for the Intoxicant Testing was also admitted as an exhibit at the hearing. This report, which was consistent with Director Gwyn's testimony regarding the revenues and expenses, stated that the revenue from the Intoxicant Testing fund supports "TBI operating expenditures in all its divisions, which include travel, training, supplies and equipment" and that "[i]n any given year, when revenue exceeds expenditures, those [surplus] funds are reserved, as directed by Tennessee Code Annotated."

Director Gwyn said there was no way to project how many of these BADT fees would be collected or what types of expenses the TBI would have in a given year. However, he said that by increasing this fee, the TBI was able to avoid "lay[ing] off forensic scientists" and was able to avoid "pass[ing] that [fee] back onto local law enforcement who could not pay it at the end of the day."

When Senator Todd Gardenhire asked if there might be an incentive for the TBI to do extra testing to get additional money to pay for its expenses, Director Gwyn responded, "Absolutely not. There's no way to do any extra testing." Senator Gardenhire then noted that some of the senators on the committee had suggested that to avoid the appearance of impropriety, the money from these fees should flow into the general fund, and the TBI could request appropriations to cover its expenses, which would remove the appearance that the fee was a "revenue-generator." To this, Director Gwyn replied:

> Yes. I mean, I think someone can say almost anything they want to say. You know, does a patrol officer out here calibrate his radar gun so it shows someone speeding at a higher rate of speed to write a ticket to generate revenue from tickets?
>
> I think we just have to let our testing stand on its own. There's been plenty of trial and defense attorneys that have taken our toxicology and our blood alcohol exams, outsourced them to private laboratories.
>
> Unfortunately, we had one incident in the Chattanooga area where a young forensic scientist [Kyle Bayer] made a mistake. He paid for that mistake. He was dismissed. We've outsourced all of the cases that [Kyle Bayer] had worked. We have 2,000 of them back, and there's been no other mistakes.
>
> So, obviously, we don't want the appearance that we're doing anything wrong. We're an open book. We're as transparent as it can be,

and we welcome anybody to come in and outsource any type of testing that they would like to see.

We just felt like that, on a conviction, part of the court fee could go to this so that we would not have to bring it back on local law enforcement and hurt them in that way, with some of them not being able to fund [these tests]. This type of testing is very expensive.

[The Intoxicant Testing Fund] was not meant to make [the] TBI rich. And, as you can see, with a million and something left over, that could be used up probably in about two instruments within the laboratory.

So, but, at the will of whatever the legislature thinks, you know, obviously, I will abide by that. But, you know, and I guess that's the best answer. I mean, we don't want any negative cloud hanging over our head, obviously.

But, I think, no matter sometimes what you do, it's hard to—you know, you can be painted in a bad light no matter what you do.

And we could have probably asked to have a fee placed on all testing whether they were convict[ed] or not convict[ed], but we didn't think that was the way to go either.

We just felt like that, if there was a conviction, it went through the court process, and that person, they had an attorney or whoever and they chose to take that sample and get it outsourced to check behind us, then that would take care of any need for any type of reason of why we would have wrongly accused someone[.]

Director Gwyn stated that in years' past, when the TBI's budget had been reduced, the TBI "cut back on training, and we gave up positions where I was down to nothing but agents left to cut and forensic scientists," which he said affected the cases being worked and the efficiency of the lab testing and could result in the "shut down of the court system." He added that one of the ways he had tried to alleviate the backlog for testing was to see if there was a way "to generate some revenue internally" so that the TBI did not "have to keep coming back . . . every year asking for appropriations, more and more appropriations[.]"

The defense also submitted, by stipulation, an exhibit containing testimony of Director Gwyn that was made in lieu of a personal appearance at the motion hearing.

Therein, Director Gwyn stated that the increase to $250 BADT fee was "necessary to offset state budget cuts that would have severely hampered state law enforcement efforts." He acknowledged that in 2008-09, the actual cost to the TBI for a blood alcohol test was $84 and for a toxicology test was $275 and that in the three years prior to the increase in the BAT/BADT fee, the TBI charged a BADT fee of $100. Director Gwyn said that if the BADT fee had not been increased from $100 to $250, eight Special Agents positions and eight Special Agent/Forensic Scientists positions would have been at risk for being eliminated. Director Gwyn acknowledged that AIT Laboratories[1] was charging the TBI a flat rate of $35 for ethyl alcohol testing in its retesting of a large batch of TBI samples. However, he said this amount was "not comparable with the total toxicological services provided by TBI" and "did not include any courtroom testimony." He also asserted that 35% to 40% of the samples submitted to the TBI for toxicological analysis required a full drug screen in addition to the ethyl alcohol analysis. Director Gwyn stated that the proceeds from the increased BADT fee were used to cover all TBI operational costs, including retesting samples at AIT Laboratories, testing for drugs other than alcohol, courtroom testimony, and travel and training for its forensic scientists. Finally, he said that convictions could be based on a breath alcohol analysis, a blood alcohol analysis, a drug screen, or a combination of testing and that the type of testing performed was unrelated to the amount of the fee.

The defense also submitted an exhibit containing documents from a case involving Dale Ferrell, who had been charged with vehicular homicide and DUI. The documents showed that the State filed a motion to dismiss the indictment against Ferrell after it discovered that TBI Agent Kyle Bayer, a forensic scientist, had failed to follow TBI protocol and had switched another defendant's sample with Ferrell's sample. As a result, Agent Bayer's TBI report showed that Ferrell had a blood alcohol concentration (BAC) of .24%, when Ferrell's actual blood alcohol concentration was .01%. After discovering this error, the TBI had all samples tested by Agent Bayer retested by AIT Laboratories. Additional records regarding the retesting of some of the blood samples originally tested by Agent Bayer were admitted as an exhibit. For the majority of the samples, the retesting showed a BAC that was the same or slightly higher than Agent Bayer's test result; however, for 43 out of the approximately 250 samples, the retesting showed a slightly lower BAC than Agent Bayer's test result.

The defense also presented testimony from Raymond W. Fraley, an attorney in Lincoln County, who stated that he had handled over 2000 DUI cases. Fraley said that over the years, he noted that there was an increase in emphasis on blood and breath tests

---

[1] AIT Laboratories is an independent lab that the TBI hired to retest blood samples after it discovered that Agent Kyle Bayer, a forensic scientist, had inadvertently switched two samples when he failed to follow TBI protocol.

and that there were now crimes and penalties that were proved through a chemical test result, like DUI per se for individuals with a BAC of 0.08% or increased jail time for individuals with a BAC of 0.20% or more. Fraley said he did not always have blood samples independently tested because in some cases, for example, when a defendant had admitted to drinking several beers, retesting would not be helpful. He asserted that some of the errors in TBI testing would escape notice because the test result, whether correct or incorrect, would not necessarily be at odds with what the defendant disclosed to his attorney, i.e., that he had some drinks prior to submitting to the blood or breath test. He also said that judges and prosecutors relied heavily on the accuracy of the TBI's test results and that these test results influenced whether a defendant would fight the case, which was very expensive, or enter a guilty plea.

Fraley acknowledged that the $250 fee for independent testing of the sample was "moderately inexpensive." However, he said that in those cases where he gets a variance from the TBI test results, he then files a motion to dismiss, for which he must charge his client an additional legal fee. Fraley added that in cases he has to try in circuit or criminal court, experts can cost his clients $15,000 to $40,000. As to the claim that any TBI bias could be explored through cross-examination, Fraley countered that cross-examination was not an appropriate safeguard because 85% of DUI cases settled prior to trial.

Fraley stated that he had his clients' blood independently tested in less than 15% to 20% of his cases and that in those cases, the independent test results had not differed from the TBI test results. He stated that the TBI had recently started doing duplicate testing of blood samples, which he believed was "good science."

Fraley said he was aware of a case in Marshall County, where Agent Kyle Bayer had found that the sample had a BAC of 0.09% but an independent test of the sample showed that it had a BAC was 0.07%. In addition, he was aware of a case in Maury County, where Agent Bayer said the BAC was 0.21%, and the independent test of the sample showed that it had a BAC of 0.17%. Fraley stated that in one of his own cases, he took the deposition of Agent Bayer's supervisor, Jeff Crews, who claimed that Agent Bayer had made only one mistake with his test results, which was not true, in light of the two aforementioned cases in Marshall County and Maury County. Fraley noted that the information he received about the retests of the samples originally tested by Agent Bayer came from the State's experts or from practitioners that he knew and that there was no committee overseeing the retests to determine if there were further inaccuracies. During this hearing, the State made a continuing objection to all of Fraley's testimony, with the exception of his anecdotal experiences.

The defense also presented the testimony from Lloyd Levitt, an attorney in Hamilton County, who testified that he had handled over 1000 DUI cases. Levitt stated that the Official Alcohol Report from the TBI was "the driving factor in any DUI case" and that the BAC results included in this report greatly influenced the prosecutor's desire to reduce the charge. Levitt said that since the 2012 change in the law making blood tests mandatory if an impaired person killed or injured another person, there had been "a huge increase in blood testing." He stated that the TBI had gotten overwhelmed with the increasing number of blood draws following the 2012 change in the law, which had resulted in a four- to five-month delay in receiving the test results and sometimes a delay of over a year if the samples were sent back for a retest. Levitt agreed that the increasing number of blood draws meant that the TBI was receiving substantially more money from the $250 BADT fees assessed for each conviction.

At the conclusion of the hearing, the court heard arguments from defense counsel and the State. Defense counsel noted that the fact that this $250 BADT fee went directly to the TBI was an exception to the general rule in Tennessee that all revenue went into the State's general fund before being disbursed to the various state entities. He admitted that there was no overwhelming evidence that the TBI was biased or was trying to manipulate the blood test results in order to increase its chances of receiving the BADT fee. However, he asserted that he did not have to show actual bias, only an appearance of impropriety, in order to establish that the statute violates due process. He also said that the fact that Code section 38-6-103(g) makes TBI test results prima facie admissible in any judicial or quasi-judicial proceeding only further enhances the appearance of impropriety. Defense counsel said it was very difficult to defend DUI cases because 85% percent of defendants, when faced with the TBI test results, pled guilty rather than hiring an expert to contest the TBI's test results. He also noted that the experts who were available to most defendants worked for the TBI, and these experts had a financial incentive to convict in order for the TBI to collect the BADT fee. Defense counsel asserted that just as it would be unconstitutional for trial judges to receive a $250 fee for each conviction, it was also wrong for the TBI to receive a $250 bounty for convicting individuals.

Finally, as to the independent retests in the wake of discovery of Agent Bayer's error, defense counsel acknowledged that most of the 2800 samples that were retested did not have a large variance; however, he asserted that several of the retested samples showed a BAC that was lower than Agent Bayer's results. Defense counsel said that he was not arguing that the TBI falsified BAC test results but was contending that the $250 fee violated the defendants' right to due process because it created the appearance of impropriety and the potential for abuse based upon financial interest.

In response, the State argued that due process was not violated by the collection of fines and that the only way the defense could succeed in its motion was if it showed that the TBI forensic scientists were falsifying test results in order to obtain this $250 BADT fee for each conviction.

Before the trial court entered an order regarding this motion, the defense supplemented the record with the TBI's summary of Agent Kyle Bayer's blood alcohol tests and the AIT Laboratory's retests of these samples, which the defense received in response to its Open Records Act request. In a cover letter that was part of this response, TBI Assistant Director Robert Daniel Royse made the following statements:

> On October 3, 2013[,] TBI was notified of a discrepancy in blood alcohol testing results. Both an independent and an internal reanalysis of the data associated with these samples indicate that Kyle Bayer <u>inadvertently</u> switched two blood tubes at the time of analysis. While all indications were that this was an isolated incident, confidence in the results issued by our Laboratory is of paramount importance to the TBI. Therefore, arrangements were made for an independent laboratory to reanalyze every positive Blood Alcohol Analysis performed by this examiner. Through the State of Tennessee's competitive bidding process AIT Laboratories was awarded the contract for retesting, which totaled 2,827 samples.

> The scope of this independent laboratory retesting was to determine if any samples had been switched by Kyle Bayer. Review of these 2,827 retested samples indicates that in all other cases the correct blood sample was originally analyzed by TBI. Some variation should be expected between any two scientific measurements. When comparing the retested data one must consider that ethyl alcohol is a volatile compound and many factors such as sample age, volume of sample available for retesting, sample condition, and the number of times the blood tube has been opened may influence the results. Additionally, it must be noted that the supplied TBI result is the lower of two analyses and has been truncated from four decimal points supplied by the analytical instrument down to two decimal places for reporting purposes; therefore[,] any statistical comparison between truncated and non-truncated data may be problematic.

> The enclosed data lists the first and second retest as performed by AIT Laboratories, the average of the AIT Laboratories' retested data, and for comparison the original TBI result as reported. Any identifying

information, e.g. subjects' names and laboratory case numbers, has been redacted to protect the privacy of those individuals.

The summary of Agent Kyle Bayer's blood alcohol tests and the AIT Laboratory's retests showed that in some cases the retested samples had a BAC that was lower than Agent Bayer's results, which meant that the 0.08% and 0.20% thresholds for DUI per se and enhanced DUI punishment were not met on retest.

**Denial of Motion to Dismiss, or in the Alternative, Motion to Suppress.** On December 11, 2014, the three Hamilton County Criminal Court Judges, sitting en banc, entered an order denying the motion but granting the defense's request for a jury instruction. In this order, the trial court made the following findings of fact and conclusions of law:

[W]hat the Court must determine is whether the statute in issue creates such pressure on TBI forensic scientists and expert witnesses that admission of their evidence deprives defendants of due process or a fair trial.

The statutory financial interest is not negligible. It is true that, in any one case, the interest is small. Were there no statute, i.e., were there no reason to consider more than one case at a time, thorough cross-examination and jury instruction would suffice to preserve a defendant's rights to due process and a fair trial.

The statute, however, not only creates a contingent-fee system, like the one in Brown [v. Edwards, 721 F.2d 1442 (5th Cir. 1984)]; it creates a contingent-fee-dependent system. In the aggregate of cases, the financial interest is very large. The statutory fees fund laboratory positions, equipment, professional development, and more.

Arguably, the statutory, contingent-fee dependent system encourages both personal and institutional bias in scientific work much of the value of which even the state recognizes depends on the lack of influence on the scientist. Apparently, too, such a system is unnecessary, the state not disputing the existence of acceptable alternatives. Furthermore, that the parties do not cite and the Court does not find any precedent for giving forensic scientists and laboratories a statutory financial interest in DUI convictions suggests that other states, who, presumably, share this state's legitimate goal of discouraging DUI in part by making offenders responsible for laboratory costs, do not regard such an interest as fair.

Despite the magnitude of the aggregate financial interest, however, the Court concludes that it does not necessitate the exclusion of the results of breath or blood tests. Presumably, it is impossible to calibrate breath-test machines to overstate any positive result. Thus, no financial interest on the calibrator's part can affect the results of breath tests.

As for blood tests, presumably, despite the evidence of acknowledged and unacknowledged errors in blood tests, it is impossible to calibrate blood-test machines to overstate any positive result. The sole acknowledged error in the record was a transposition error; perhaps the unacknowledged errors in the record lie within the margin of error. Presumably, too, despite the statement in the reports in the record that "[t]he above represents the interpretations and opinions of the analyst[,"] blood tests are subject to minimal, if any, interpretation or opinion.

Although deliberate falsifications attributable to financial interest remain a possibility, presumably, what protects defendants from accidental transposition errors also protects them from deliberate falsifications: the availability of independent analysis of blood, at state expense in appropriate cases, and the availability of underlying "technical notes and data" that, according to a statement in the reports in the record, the laboratory maintains in its case records. Thus, the financial interest in obtaining DUI convictions is offset by financial and other interests in continuing to have employment and avoiding criminal liability, making the possibility of a deliberate falsification attributable to financial interest remote without necessarily changing defendants' calculations regarding the advisability of independent analysis.

**Denial of Application for Interlocutory Appeal.** Following entry of the December 11, 2014 order, Decosimo and the other defendants filed a consolidated motion for an interlocutory appeal, which the trial court granted. Thereafter, this court denied the defendants' application for an interlocutory appeal, and the Tennessee Supreme Court denied the defendants' application to appeal from this court's order of denial. The State also filed a motion for an interlocutory appeal regarding the trial court's decision to grant a jury instruction regarding the $250 BADT fee, but this motion was dismissed by the trial court on the grounds that the motion was untimely, that another hearing on the State's motion would subject the defendants to additional and unnecessary burden and expense, and that the State could file an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure. Following the denial of the interlocutory appeal, the trial judge assigned to Decosimo's case recused himself from the case, and the case was reassigned to a special judge.

**September 27, 2016 Hearing.**   At a hearing on September 27, 2016, Decosimo made an oral motion for the special judge to reconsider the previous ruling made by the three criminal court judges, sitting en banc, regarding her motion to dismiss, or in the alternative, motion to suppress.  Although the special judge denied this motion, he did allow information from the TBI's March 3, 2015 Budget Hearing before the Senate Judiciary Committee[2] as well as new financial information from the Tennessee Department of Revenue regarding the BADT fees collected on convictions for vehicular assault, vehicular homicide, aggravated vehicular homicide, simple possession or casual exchange of a controlled substance, reckless driving, and DUI  to be made exhibits to this hearing.

**Plea Submission Hearing.**   At the March 8, 2017 plea submission hearing, Decosimo reiterated her assertion that Code section 55-10-413(f) was unconstitutional, and the trial court heard additional argument regarding the defense's request that the trial court reconsider its previous ruling on the motion to dismiss, or in the alternative, motion to suppress.  During the course of this hearing, the trial court commented that Decosimo's argument regarding the unconstitutionality of the statute rested on her showing that the TBI had manipulated the test results in order to obtain convictions.  When the trial court asserted its belief that the $250 BADT fee was no different from any other court cost assessed following a conviction, defense counsel replied that the BADT fee to the TBI was different because it went directly into the TBI special fund, over which the TBI has total control, rather than State of Tennessee's general fund.  The trial court also asserted that because the district attorney had the authority to determine whether an individual is charged, a buffer existed between the citizen and the TBI, even though the TBI had a financial interest in obtaining convictions, and defense counsel replied that DUI prosecutors might have an interest in obtaining convictions based upon how their salaries were funded.  During the course of the plea submission hearing, the trial court allowed new financial information regarding the money obtained by the TBI from BADT fees to be entered as a supplemental exhibit pursuant to an agreement between the parties.[3]

---

[2] During the March 3, 2015 Budget Hearing, Senator Gardenhire said he had reviewed TBI's report, which stated that the State made approximately 29,554 DUI arrests, with an 89% conviction rate, and that defendants who were convicted of DUI paid a fee of $250 to the TBI.  Senator Gardenhire made the statement that with an 89% conviction rate, this would mean that the TBI received over $6,000,000 each year from these fees.  He then questioned why the TBI only reported earning $3,000,000 from these fees.  Ed Jones, the Deputy Director of the TBI responded that this disparity could be caused by the difference between the time of arrest and the time of adjudication, and Director Gwyn added that the TBI had never received $6,000,000 in any given year from this fee.

[3] This supplemental exhibit included the Department of Revenue's responses to the defense's public records request for the total amounts collected from the $250 BADT fee imposed by Code section 55-10-413(f) as well as the following table, which corresponded to the Department of Revenue's more detailed response that listed the BADT fee collections for each county:

After hearing the parties' arguments and reviewing this new financial information regarding BADT fee collections, the special judge found that the statute was not unconstitutional and denied the motion to dismiss, or in the alternative, motion to suppress.

At that point, the parties moved on to Decosimo's plea submission hearing. The State recited the facts underlying the plea, explaining that Decosimo had been stopped by law enforcement and had submitted to a blood test, which showed her BAC to be 0.16%. Decosimo then entered a nolo contendere plea to DUI per se, reserving a certified question of law, and the State entered a nolle prosequi as to her remaining charges. Pursuant to her plea agreement, Decosimo reserved the following certified question of law:

> Whether the trial court erred in not dismissing this case, or alternatively, suppressing the blood alcohol evidence without which the State could not proceed against [Decosimo] on this DUI per se conviction, where T.C.A. § 55-10-413(f) is unconstitutional in violation of due process and right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and under article I, sections 8 and 9 of the Tennessee Constitution based on the fact that the Tennessee Bureau of Investigation (TBI) receives a $250 BADT/BAT fee in every case in which a <u>conviction</u> is obtained for driving under the influence or other listed offense, wherein a TBI blood test or TBI-calibrated breath test result is used, thereby creating a "contingent-fee-<u>dependent</u> system" susceptible to bias because the TBI's testing and interpretation of these tests play the determinative role in the prosecution or the charge, and a jury instruction regarding the statutory

| Year | BADT Collection |
|---|---|
| 2005 | $138,437.90 |
| 2006 | $794,822.83 |
| 2007 | $1,011,324.52 |
| 2008 | $1,019,760.76 |
| 2009 | $970,221.02 |
| 2010 | $989,049.49 |
| 2011 | $2,018,651.25 |
| 2012 | $2,655,556.39 |
| 2013 | $3,005,840.02 |
| 2014 | $3,145,794.60 |
| 2015 | $3,306,940.32 |
| 2016 | $3,003,571.80 |
| TOTAL | $22,059,970.90 |

incentive in favor of conviction is insufficient to cure the magnitude of the constitutional violation?

Both the judgment for Decosimo's DUI per se conviction and the agreed order on the certified question were filed on March 8, 2017. On March 30, 2017, Decosimo filed a timely notice of appeal.

## ANALYSIS

Decosimo argues that because Tennessee Code Annotated section 55-10-413(f), which gives the TBI $250 for each DUI conviction that is obtained using a blood or breath test, is unconstitutional, the trial court erred in denying her motion to dismiss, or in the alternative, motion to suppress on that basis. Decosimo specifically asserts that Code section 55-10-413(f) violates her right to due process and a fair trial because it creates a "contingent-fee-dependent system" that gives the TBI and its forensic scientists a financial incentive to ensure convictions. The State counters that the trial court properly denied Decosimo's motion because Code section 55-10-413(f) is constitutional. After reviewing the record in this case, we conclude that Code section 55-10-413(f) violates due process principles and that the trial court erred in failing to grant the motion to suppress.

At the time of Decosimo's arrest, Code section 55-10-419 (2012), which imposed a $250 BADT fee for blood and breath tests and required the deposit of this fee into the TBI's toxicology unit intoxicant testing fund, provided:

> (a)(1) In addition to all other fines, fees, costs and punishments now prescribed by law, including the fee imposed pursuant to § 55-10-403(h), <u>a blood alcohol or drug concentration test (BADT) fee in the amount of two hundred and fifty dollars ($250) shall be assessed</u> upon a conviction for a violation of § 39-13-106, § 39-13-213(a)(2), § 39-13-218, § 39-17-418, § 55-10-205 or § 55-10-401, <u>for each offender who has taken a breath alcohol test on an evidential breath testing unit</u> provided, maintained and administered by a law enforcement agency for the purpose of determining the breath alcohol content <u>or has submitted to a chemical test to determine the alcohol or drug content of the blood or urine.</u>

> (2) In addition to all other fines, fees, costs and punishments now prescribed by law, including the fee imposed pursuant to § 55-10-403(h), a blood alcohol or drug concentration test (BADT) fee in the amount of one hundred dollars ($100) shall be assessed upon conviction for a violation of § 39-13-106, § 39-13-213(a)(2), § 39-13-218 or § 55-10-401, if the blood

or urine of the convicted person was analyzed by a publicly funded forensic laboratory or other forensic laboratory operated by and located in counties having a population of not less than eighty-seven thousand nine hundred (87,900) nor more than eighty-eight thousand (88,000), according to the 2000 federal census or any subsequent federal census, for the purpose of determining the alcohol or drug content of the blood.

(b)(1) The fee authorized in subdivision (a)(1) shall be collected by the clerks of the various courts of the counties and forwarded to the state treasurer on a monthly basis for deposit in the Tennessee [B]ureau of [I]nvestigation (TBI) toxicology unit intoxicant testing fund created as provided in subsection (c), and designated for exclusive use by the TBI for the purposes set out in subsection (c).

(2) The fee authorized in subdivision (a)(2) shall be collected by the clerks of the various courts of the counties and shall be forwarded to the county trustees of those counties on a monthly basis and designated for the exclusive use of the publicly funded forensic laboratory in those counties.

(c)(1) There is created a fund within the treasury of the state, to be known as the TBI toxicology unit intoxicant testing fund.

(2) Moneys shall be deposited to the fund pursuant to subsection (b), and as may be otherwise provided by law, and shall be invested pursuant to § 9-4-603. Moneys in the fund shall not revert to the general fund of the state, but shall remain available for appropriation to the Tennessee bureau of investigation, as determined by the general assembly.

(3) Moneys in the TBI toxicology unit intoxicant testing fund and available federal funds, to the extent permitted by federal law and regulation, shall be used to fund a forensic scientist position in each of the three (3) bureau crime laboratories, to employ forensic scientists to fill these positions, and to purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner. To the extent that additional funds are available, these funds shall be used to employ personnel, purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner.

T.C.A. § 55-10-419 (2012) (emphases added).[4]

In 2005, the legislature first introduced a $100 fee for blood and breath tests. See T.C.A. § 55-10-419 (2005) (identifying the fee as a blood alcohol concentration test (BAT) fee); 2005 Tenn. Pub. Acts, ch. 483, § 7; see also T.C.A. § 55-10-419 (2006); 2006 Tenn. Pub. Acts, ch. 998, § 2 (identifying the fee as a blood alcohol or drug concentration test (BADT) fee rather than a blood alcohol concentration test (BAT) fee). In 2010, the legislature, based on a proposal from the TBI, raised the BADT fee to $250. See T.C.A. § 55-10-419 (2010); 2010 Tenn. Pub. Acts, ch. 1020, §§ 1, 2.

TBI Director Gwyn, in his testimony before the Senate Judiciary Committee on February 11, 2014, explained that in 2008 the TBI was "faced with some pretty deep cuts" that would have required the TBI to "shut down some disciplines with our crime laboratory" or to "start charging local law enforcement for testing." He said that in order to avoid either of those alternatives, the legislature "increase[d] the fee on the toxicology testing and blood alcohol testing." He added that by increasing the fee, the TBI was able to avoid "lay[ing] off forensic scientists." Despite the fact that the BADT fee was raised to $250 to cover the TBI's budget deficits, Director Gwyn acknowledged that between the years of 2009 and 2012, the TBI's toxicology unit intoxicant testing fund netted a surplus of approximately $1,600,000. The record is silent as to the how the surplus was used.

Both the version of the statute that was in effect at the time of Decosimo's arrest and the current version of Code section 55-10-413(f) state that the money from the $250 BADT fee shall be deposited in the TBI toxicology unit intoxicant testing fund "for exclusive use by the TBI" and shall be used to "fund a forensic scientist position in each of the three (3) bureau crime laboratories, to employ forensic scientists to fill these positions, and to purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner." T.C.A. §§ 55-10-419(b)(1), (c)(3) (2012); 55-10-413(f)(2), (f)(3)(B) (2017). Moreover, any surplus in the intoxicant testing fund shall be used to "employ personnel, purchase equipment and supplies, pay for the education, training and scientific development of employees, or for any other purpose so as to allow the bureau to operate in a more efficient and expeditious manner." Id. §§ 55-10-419(c)(3) (2012), 55-10-413(f)(3)(B) (2017).

---

[4] On July 1, 2013, this section of the code was transferred from Code section 55-10-419 to Code section 55-10-413. In 2016 and 2017, the legislature made minor amendments to Code section 55-10-413, although the provisions regarding the $250 BADT fee for blood and breath tests and its deposit into the TBI toxicology unit intoxicant testing fund remained the same.

Historically, fee system courts have been condemned because judges should not have a direct or indirect pecuniary interest in the litigation before them.  See Dr. Bonham's Case, 77 Eng. Rep. 638 (C.P. 1610) (holding that "no person may be a judge in his own cause" and that "when an act of parliament is against common right or reason, or repugnant, or impossible to be performed, the common law will control it, and adjudge such Act to be void"); see also Theodore F.T. Plucknett, Bonham's Case and Judicial Review, 40 Harv. L. Rev. 30, 34 (1926) (discussing Chief Justice, Sir Edward Coke's holding in Dr. Bonham's case that no man should be a judge in his own case).  The general rule is that "officers acting in a judicial or quasi[-]judicial capacity are disqualified by their interest in the controversy to be decided."  Tumey v. Ohio, 273 U.S. 510, 522 (1927) (internal citations omitted).

It is also well-established that fines and fees should not be used to generate revenue for a court or government agency.  In 1974, the American Bar Association adopted certain standards regarding court policies and rules.  See Brown v. Vance, 637 F.2d 272, 277 (5th Cir. 1981).  Section 1.53 of these standards provided the following:

> "1.53 Revenues from Fines. The purpose of fines and other exactions imposed through judicial proceedings is to enforce the law and not to provide financial support for the courts or other agencies of government. All revenues from fines, penalties, and forfeitures levied by a court should be transferred to the state general fund, and should not be appropriated to the court receiving them or by a local unit of government that supports such a court."

Id. (emphasis added) (quoting ABA Comm. Standards of Judicial Administration 107 (1974)).  While Section 1.53 specifically identifies "fines and other exactions," the commentary for this section clarifies that this standard also applies to fees.  Id. n.6 (citing ABA Comm. Standards of Judicial Administration 107 (1974)).  Specifically, the commentary states:

> "The use of courts as revenue-producing agencies is a continuing abuse of the judicial process.  It has long been recognized as unconstitutional for a judge to have his income dependent on the outcome of cases before him, but a similar result often occurs indirectly when the budget of the court in which he sits is established with reference in whole or in part to the fine revenues produced by the court. This is at present a common practice in local courts of limited jurisdiction.  It should be eliminated.  See Ward v. Village of Monroeville, 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972), Tumey v. Ohio, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927)."

- 17 -

Id. (emphasis added) (quoting ABA Comm. Standards of Judicial Administration 107 (1974)).

The concept that a judge, or other individual serving in an adjudicatory capacity, should not have a pecuniary interest in the outcome of a case has been comprehensively developed in case law. In support of her constitutional claim, Decosimo relies, in part, on Tumey, Ward, and Connally, the trilogy of Supreme Court cases governing bias of a judge or adjudicator based on a pecuniary interest in the controversy. We will address each case in turn. In Tumey, 273 U.S. at 514-15, the United States Supreme Court considered whether a state statute that allowed charges for violating the Prohibition Act to be tried without a jury before the village mayor, who had a pecuniary interest in the case, violated the Fourteenth Amendment. The mayor, who had primarily executive duties, was paid a salary but was also compensated for his duties as a judge directly from fees or costs that were assessed against convicted defendants. Id. at 519-20. In addition, the fines from the mayor's court provided substantial funds that were used for village improvements and repairs, for which the mayor indirectly benefitted as an owner of a house in the village. Id. at 521. The Court held, "But it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case." Id. The Court then outlined the test for determining whether a fee system violated due process:

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused denies the latter due process of law.

Id. The Court also concluded that aside from the mayor's direct, pecuniary interest in convicting defendants, due process was also violated because of the close relationship between the fees collected in the mayor's court, which helped to relieve the village from further taxation, and the mayor's responsibility for the finances of the village:

> The mayor represents the village and cannot escape his representative capacity. On the other hand, he is given the judicial duty, first, of determining whether the defendant is guilty at all; and, second, having found his guilt, to measure his punishment between $100 as a minimum and $1,000 as a maximum for first offenses, and $300 as a minimum and $2,000 as a maximum for second offenses. With his interest as mayor in the financial condition of the village and his responsibility therefor, might not a defendant with reason say that he feared he could not get a fair trial or

a fair sentence from one who would have so strong a motive to help his village by conviction and a heavy fine? The old English cases cited above in the days of Coke and Holt and Mansfield are not nearly so strong. A situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.

Id. at 533-34 (citations omitted).

In Ward v. Village of Monroeville, 409 U.S. 57 (1972), the United States Supreme Court rejected certain procedural safeguards as a way to circumvent Tumey. In Ward, the mayor of Monroeville had broad executive duties because he was president of the village council and accounted annually to the council regarding the village's finances; however, the mayor also had judicial duties because he presided over a mayor's court that handled ordinance violations and specific traffic offenses. Id. at 57-58. While the mayor had no direct, pecuniary interest in the outcome of his cases, a substantial portion of the village's income came from the fines, forfeitures, costs and fees assessed against convicted criminal defendants in the mayor's court. Id. at 58. The Court, reiterating the Tumey standard, held that "the test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused . . . .'" Id. at 60 (quoting Tumey, 273 U.S. at 532). The Court specifically noted that a "'possible temptation'" could occur "when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." Id.

Next, in Connally v. Georgia, 429 U.S. 245 (1977), the United States Supreme Court considered whether a fee system that governed the issuance of search warrants by justices of the peace was constitutional. In that case, the justice of the peace did not receive a salary, and he was only compensated by receipt of a $5 fee fixed by statute when he issued a warrant but was not paid when he declined to issue a warrant. Id. at 246-47. The appellant in that case argued that marijuana found pursuant to the search warrant should be suppressed because the justice of the peace who issued the warrant was not a neutral and detached magistrate, given his pecuniary interest in issuing the warrant. Id. at 246. The trial court denied the motion, and the Supreme Court of Georgia affirmed the trial court. Id. On appeal, the United States Supreme Court recognized that the facts in Connally varied from those in Tumey or Ward but nevertheless applied the Tumey-Ward test to the issuance of warrants by justices of the peace. Id. at 250. The Court noted that the justice's financial welfare was "enhanced by positive action and [was] not enhanced by negative action," which created the possible temptation to an average man

as a judge "'not to hold the balance nice, clear and true between the State and the accused.'" Id. (quoting Ward, 409 U.S. at 60). Consequently, the Court held that the fee system governing the issuance of search warrants by justices of the peace violated the Fourth and Fourteenth Amendments. Id. at 251.

In the present case, Decosimo argues that Code section 55-10-413(f) is unconstitutional. We recognize that issues of constitutional interpretation are questions of law, which this court reviews de novo with no presumption of correctness. State v. Merriman, 410 S.W.3d 779, 791 (Tenn. 2013); State v. White, 362 S.W.3d 559, 565 (Tenn. 2012) (citing Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008)). "In construing legislative enactments, we presume that every word in a statute has meaning and purpose; each word should be given full effect if the obvious intention of the General Assembly is not violated by so doing." Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ., 244 S.W.3d 302, 309 (Tenn. 2007) (citing In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005)). "When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). On the other hand, if the statute is ambiguous, we must look to the "broader statutory scheme, the history of the legislation, or other sources to discern its meaning." State v. Casper, 297 S.W.3d 676, 683 (Tenn. 2009). Moreover, we must presume that a statute is constitutional. White, 362 S.W.3d at 566 (citing State v. Pickett, 211 S.W.3d 696, 700 (Tenn. 2007)). This court has a "'duty to adopt a construction which will sustain a statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution.'" State v. Burgins, 464 S.W.3d 298, 305 (Tenn. 2015) (quoting Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 529 (Tenn. 1993)). Because the statutory language in Code section 55-10-413(f) is clear and unambiguous, we must apply the plain meaning of the words used.

Decosimo argues initially that the fee system established in Code section 55-10-413(f) denies due process and a fair trial in part because it fails to ensure a blood or breath test free from bias under the Tumey-Ward test. The State responds that the Tumey-Ward test is inapplicable because the TBI does not perform judicial functions in criminal cases. It contends that TBI forensic scientists are experts, not judges, and are therefore not required to be neutral. See Tenn. R. Evid. 702. It also contends that the TBI forensic scientists are salaried employees, and that even if their salaries are paid from the funds generated by BADT fees, this connection is too remote to constitute a due process violation. Based on the following law and analysis, we are unable to conclude that TBI forensic scientists perform adjudicatory functions.

In order to fully examine this issue and based on the extensive record developed in the trial court, we recognize that in the vast majority of prosecutions for DUI, vehicular assault, vehicular homicide, etc., the BAC test result provided by the TBI forensic scientists is the most significant piece of evidence against the defendant. This BAC result determines whether the defendant is found guilty of DUI per se under Code section 55-10-401(2) or is subject to enhanced jail time pursuant to Code section 55-10-402(a)(1)(B), affects the defendant's decision to pursue a trial or enter a guilty plea, and provides persuasive evidence to a judge or jury regarding whether a defendant was impaired. See State v. Livesay, 941 S.W.2d 63, 64 (Tenn. Crim. App. 1996) ("It is difficult to overstate the importance of evidence of blood alcohol content in DUI prosecutions."). In particular, the DUI per se law, which makes it a crime for an individual to have a BAC of 0.08% while operating an automobile, removes the State's burden of proving that a defendant was driving while impaired and creates a strict liability offense that, in the overwhelming majority of cases, is based solely on the finding of the TBI forensic scientist regarding the defendant's BAC. See T.C.A. § 55-10-401(2). What is more, the TBI's BAC results are "prima facie admissible into evidence in any judicial or quasi-judicial proceeding" so long as the tests are performed in compliance with the standards and procedures established by the TBI. See id. § 38-6-103(g). We agree with Decosimo that as a practical matter, the blood samples collected from defendants travel first to the TBI forensic scientists before they are eventually released, at a time determined by the TBI, to the defense for independent testing, assuming that a court order is obtained before the samples are destroyed. We also agree that in most cases, the TBI's Official Alcohol Report will induce a defendant to enter a guilty plea unless BAC result appears scientifically impossible or is completely at odds with the defendant's claim regarding the amount of alcohol consumed. Not surprisingly, because so few blood or breath samples are ever independently tested, TBI forensic scientists typically provide the only proof regarding a defendant's blood alcohol content. Indigent defendants charged with DUI are particularly affected by this reality because they cannot afford to independently test their blood or breath sample, much less hire an expensive expert to challenge the BAC result at trial, and are unlikely to be given state funds to cover these expenses in a misdemeanor prosecution.

Given the clearly dispositive nature of the BAC test results in criminal prosecutions, it is indeed a close question as to whether TBI forensic scientists do, in fact, perform adjudicatory functions. However, Decosimo has not provided, and we have not found, any authority in which a forensic examiner has been included in the definition of a judge or an administrative adjudicator as contemplated by Tumey-Ward. We derive some guidance, however, from Marshall v. Jerrico, Inc., 446 U.S. 238 (1980) (holding generally that the Tumey-Ward restrictions on decision-makers do not apply to those engaged in prosecution of administrative cases). In Marshall v. Jerrico, Inc., an assistant regional administrator imposed a substantial fine on the appellee for a child labor

violation. The appellee, relying on Tumey and its progeny, claimed that the rule against bias was violated by a section of the Fair Labor Standards Act which provided money collected as civil penalties for employment of child labor must be returned to the Department of Labor as reimbursement for amounts expended in determining the violation. In holding that the financial interest bar was not applicable to determinations of the assistant regional administrators, the Supreme Court stated:

> The assistant regional administrator simply cannot be equated with the kind of decisionmakers to which the principles of Tumey and Ward have been held applicable. He is not a judge. He performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions. The function of assessing a violation is akin to that of a prosecutor or civil plaintiff. . . .

> The rigid requirements of Tumey and Ward, designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity. Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, and similar considerations have been found applicable to administrative prosecutors as well[.]

Marshall v. Jerrico, (internal citations omitted).

Moreover, a forensic scientist typically serves as an expert witness subject to Rule 702 of the Tennessee Rules of Evidence.[5] She performs no judicial or quasi-judicial functions, hears no witnesses, and rules on no disputed factual or legal questions. We therefore agree with the State and hold that Tumey-Ward is inapplicable to this issue.

Our analysis however does not end here. Both the United States Constitution and the Tennessee Constitution protect the right to due process of law. Section 1 of the Fourteenth Amendment to the United States Constitution provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. In addition, article I, section 8 of

---

[5] Rule 702 of the Tennessee Rules of Evidence governs the admissibility of expert testimony. It provides:
> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

the Tennessee Constitution states, "[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." Tenn. Const. art. 1, § 8. The Tennessee Supreme Court has held that article I, section 8 of the Tennessee Constitution is "synonymous" with the Due Process Clause of the Fourteenth Amendment. Gallaher v. Elam, 104 S.W.3d 455, 463 (Tenn. 2003) (citing Riggs v. Burson, 941 S.W.2d 44, 51 (Tenn. 1997)).

Substantive due process has been defined in the following way:

In contrast to procedural due process, substantive due process bars oppressive government action regardless of the fairness of the procedures used to implement the action. Lynch, 205 S.W.3d at 391-92. Substantive due process claims are divided into two categories: (1) deprivations of a fundamental constitutional guarantee, and (2) government actions that are "arbitrary, or conscience shocking, in a constitutional sense." Id. at 392 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 128, 112 S. Ct. 1061, 117 L.Ed.2d 261 (1992)). "Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history [and] solid recognition of the basic values that underlie our society.'" Moore v. City of E. Cleveland, Ohio, 431 U.S. 494, 503, 97 S. Ct. 1932, 52 L.Ed.2d 531 (1977) (quoting Griswold v. Connecticut, 381 U.S. 479, 501, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) (Harlan, J., concurring)).

Mansell v. Bridgestone Firestone North American Tire, LLC, 417 S.W.3d 393, 409 (Tenn. 2013).

Substantive due process prohibits the States from infringing on fundamental liberty interests, regardless of the procedures provided, unless the infringement is narrowly tailored to serve a compelling state interest. Chavez v. Martinez, 538 U.S. 760, 775 (2003); Washington v. Glucksberg, 521 U.S. 702, 721 (1997); Reno v. Flores, 507 U.S. 292, 301-02 (1993). In order to qualify for such protection, the individual's fundamental rights and liberties must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Glucksberg, 521 U.S. at 721 (citations and internal quotation marks omitted). "A substantive due process inquiry focuses on 'what' the government has done, as opposed to 'how and when' the government did it." See Amsden v. Moran, 904 F.2d 748, 754 (1st Cir. 1990). Individuals who claim that their right to substantive due process has been violated must show that the State's conduct shocks the conscience, or interferes with rights implicit in the concept of ordered liberty,

- 23 -

or offends judicial notions of fairness, or is offensive to human dignity, or is taken with deliberate indifference to protected rights. See Anderson v. Larson, 327 F.3d 762, 769 (8th Cir. 2003).

Criminal defendants, in particular, are entitled to considerable due process protections:

> Criminal cases, as opposed to civil cases, directly involve the fundamental constitutional liberty rights of the defendant. As a result, our judicial system recognizes significantly more due process protections in criminal cases than in civil cases. For instance, in recognition that our system of criminal justice would rather set a guilty person free than to convict an innocent one, we permit criminal defendants to be convicted only upon proof of guilt beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 372, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). Of course, most civil proceedings are decided on the much lower standard of the preponderance of the evidence. Additionally, persons defending criminal charges are vested with numerous state and federal constitutional rights to ensure a fair trial, including the constitutional rights to legal counsel, to present a defense, and to confront the State's witnesses. See U.S. Const. Amend. VI; Tenn. Const. art. I § 9. Of course, the overarching concern in criminal prosecutions is that the defendant not be convicted except upon being afforded the due process of law, including the right to a trial that is fundamentally fair. See, e.g., State v. White, 362 S.W.3d 559, 566 (Tenn. 2012) ("Due process, at its most basic level, 'mean[s] fundamental fairness and substantial justice.'") (quoting Vaughn v. State, 3 Tenn. Crim. App. 54, 456 S.W.2d 879, 883 (1970)).

State v. Larkin, 443 S.W.3d 751, 799-800 (Tenn. Crim. App. 2013). When discussing the importance of due process protections, this court has reiterated that "'[w]e cannot allow public confidence in the complete fairness and impartiality of our tribunals to be eroded and nothing which casts any doubt on the fairness of the proceedings should be tolerated.'" Id. at 800 (quoting State v. Tate, 925 S.W.2d 548, 555 (Tenn. Crim. App. 1995)).

Based on this record, we cannot ignore the fact that, pursuant to Code section 55-10-413(f)(2), the TBI receives a fee for each conviction where a blood or breath test is performed but does not receive a fee if a defendant's charges are dismissed or reduced or if a defendant is acquitted. Because the money from the $250 BADT fees is placed directly in the intoxicant testing fund which is "designated for exclusive use by the TBI," there is no question that the TBI, an agency of the State, has a direct pecuniary interest in

securing convictions. The TBI forensic scientists also have a financial interest in securing convictions because the collection of the BADT fees affects their continued employment and salary, which gives them an incentive to find that defendants' blood alcohol content is 0.08% or higher. Even though we have concluded that forensic scientists are not judges or administrative adjudicators under Tumey, we are compelled to address the inherent conflict between the requirement that a forensic scientist be neutral and objective and Code section 55-10-413, which deposits the monies received from the BAC and BADT tests directly to the TBI, rather than the State general fund.

Although the State contends that TBI forensic scientists have no obligation to be neutral, we reject any assertion that TBI forensic scientists, who are agents of the State, have no obligation to ensure that their BAC test results are accurate. While TBI forensic scientists are obviously employees of a state law enforcement bureau, they must serve as objective, independent experts in order to protect the integrity of the criminal justice system. Although police officers and informants, who often have an interest in the outcome of a case, are not expected to be neutral, forensic scientists, who engage in the objective testing of blood samples to determine a defendant's BAC, are expected to be neutral and unbiased. See Joseph L. Peterson and Anna S. Leggett, The Evolution of Forensic Science: Progress Amid the Pitfalls, 36 Stetson L. Rev. 621, 653 (Spring 2007) ("Theoretically, at least, forensic evidence should be neutral, with the scientist not having a stake in the outcome of the case.").

The requirement of a neutral and objective TBI forensic scientist fits well with the State's duty to pursue truth and justice in criminal cases. The United States Supreme Court has made it clear that "[a prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935); see State v. Culbreath, 30 S.W.3d 309, 314 (Tenn. 2000) ("[P]rosecutors are expected to be impartial in the sense that they must seek the truth and not merely obtain convictions [and] are also to be impartial in the sense that charging decisions should be based upon the evidence, without discrimination or bias for or against any groups or individuals."). The need for an unbiased TBI forensic scientist is also consistent with holdings prohibiting the State's suppression of evidence or its use of false testimony, which likewise implicate due process concerns. See Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); Kyles v. Whitley, 514 U.S. 419, 438 (1995) (holding that a prosecutor retains the responsibility, under Brady, to disclose favorable evidence to the defendant, even if police investigators fail to inform the prosecutor of this evidence); see also Napue

v. Illinois, 360 U.S. 264, 269 (1959) (reiterating that the State's failure to correct false evidence violates due process).

This fee system, which was created by the legislature at the urging of the TBI, creates a mechanism whereby the TBI forensic scientists have a pecuniary interest in BADT fees in the form of continued employment, salaries, equipment, and training within the TBI. As argued by Decosimo, the close relationship between the BADT fees and the operational expenses of the TBI creates a scenario closely akin to an expert witness contingency fee, which the Tennessee Supreme Court has held to be void because it encourages bias. See Swafford v. Harris, 967 S.W.2d 319, 323 (Tenn. 1998) (holding that "a contingency fee contract for the services of a physician acting in a medico-legal expert capacity is void as against public policy and therefore unenforceable."); Tenn. Sup. Ct. R. 8, RPC 3.4(h) (stating that a lawyer shall not "offer an inducement to a witness that is prohibited by law; or pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent on the content of his or her testimony or the outcome of the case."); see also Crowe v. Bolduc, 334 F.3d 124, 132 (1st Cir. 2003) ("The majority rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy. That rule was adopted precisely to avoid even potential bias.").

The State claims that the cases prohibiting expert contingency fees are distinguishable from Decosimo's case because TBI forensic scientists are paid a salary, rather than a contingency fee. It asserts that the scientists' salaries are not dependent on convictions in specific cases and that if blood or breath samples are compromised, then the TBI forensic scientist responsible for this error is dismissed, and the samples are retested. While we acknowledge that the BADT fees do not directly compensate the TBI forensic scientists, we nevertheless recognize that the BADT fees provide substantial funding to the state bureau employing these scientists.

The aggregate BADT fees, which currently total over $3,000,000 per year,[6] are not deposited in the state's general fund but are deposited directly in the TBI's intoxicant testing fund that is reserved "exclusively for the use of the TBI." Director Gwyn, during his 2014 testimony before the Senate Judiciary Committee, acknowledged that without increasing the BADT fees in 2010, the TBI would have had to eliminate several forensic scientist positions. Cf. Dugan, 277 U.S. at 65 (holding that because the mayor received the same salary from the city's general fund regardless of whether he convicted or acquitted the defendants in the cases before him, there was no showing that failure to

---

[6] The record shows that there has been a generally upward trend in the collection of BADT fees, which indicates that the total amount of these fees will increase over time.

convict in a case or cases would affect his fixed compensation). As recently as the TBI's 2013-14 state budget presentation, Director Gwyn stated,

> In order to meet the 5% reduction of $1,557,000 in this agency's base appropriation for the (2013-2014) budget, we will need to eliminate 18 filled positions. Due to the previously mentioned buyout, we are extremely thin in administration, so these cuts must come from the commissioned ranks. These positions will consist of 9 criminal investigators and 9 forensic scientists, further diminishing the ability to respond as quickly and will increase already lengthy backlogs.

Based on the record before us, the TBI, and specifically the forensic science division, is dependent on these BADT fees. Given the upward trend in BADT collections for each successive year, we believe that the TBI will become increasingly reliant on these fees in the future, which only serves to heighten the potential for bias among TBI forensic scientists.

The fee system in Code section 55-10-413(f) also closely resembles cases in which expert witnesses or attorneys have been disqualified for conflicts of interest. See Larkin, 443 S.W.3d at 801-804 (stating that due process mandated a presumption in favor of disqualification of an forensic pathologist, who had been employed as an expert by the defense, to testify as an expert for the State on the same or substantially similar matter in a later criminal prosecution of the defendant and concluding that the forensic scientist was, in fact, disqualified); Clinard v. Blackwood, 46 S.W.3d 177, 186 (Tenn. 2001) (confirming that "Tennessee courts have and will continue to apply the appearance of impropriety standard as a basis for [the] disqualification" of attorneys). While we acknowledge that TBI forensic scientists could lose their jobs if they falsify test results and these falsifications are discovered, we also recognize that forensic scientists would most certainly lose their jobs if funding for their positions disappears, a result of which these forensic scientists are no doubt well aware. Because the fee system at issue in this case calls into question the trustworthiness of the TBI forensic scientists' test results, it violates due process.

While the State contends that any possible bias on the part of forensic scientists can be offset by procedural safeguards, such as an independent testing of samples, a thorough cross-examination of the forensic scientist at trial, or a jury instruction addressing the credibility of TBI forensic scientists, we conclude that these procedural safeguards fail to remedy the due process violations resulting from the fee system itself. Cf. Ward, 409 U.S. at 61-62 (rejecting the claim that the procedural safeguards of an appeal and trial de novo corrected the due process violation); Brown, 637 F.2d at 280 (recognizing that an accused has a right to an unbiased magistrate or judge with or

without a jury and with or without the right to appeal and a trial de novo before a jury); see also City of White House v. Whitley, 979 S.W.2d 262, 267 (Tenn. 1998) (concluding that "the due process violation resulting from the lack of an attorney judge is not cured by the statutory right to a de novo appeal."). We conclude that independent testing is not an adequate safeguard because it impermissibly shifts the burden of proof from the State to the defense. Because the State has the duty to pursue truth and justice, it has the obligation to provide an accurate, unbiased BAC result, not a result that is deemed correct until disproved by the defendant. Under the scenario suggested by the State, the defendant is forced to obtain an independent test, to pay for an attorney to defend him, and to hire an expensive expert to challenge the BAC result in order to do what an unbiased TBI forensic scientist should have done from the beginning. Lastly, because so many DUI cases end in guilty pleas, rather than trials, we conclude that neither a jury instruction nor vigorous cross-examination of TBI forensic scientists corrects the fact that Code section 55-10-413(f) violates due process. Accordingly, we hold that the trial court erred in failing to suppress the test results in this case.

## CONCLUSION

Because Code section 55-10-413 violates the Due Process Clause of the Fourteenth Amendment and article I, section 8 of the Tennessee Constitution, we reverse the judgment of the trial court and remand for proceedings consistent with this opinion.

_____
CAMILLE R. MCMULLEN, JUDGE